**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JUAN MENDEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-cv-6313 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| CITY OF CHICAGO, CHRISTIAN | ) | |
| SZCZUR, and DAVID COOK, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Juan Mendez has brought Fourth Amendment claims and related state law claims against two Chicago police officers—Christian Szczur and David Cook (collectively, "the Officers")—and the City of Chicago ("the City"). Defendants move for summary judgment on Mendez's claims for excessive force, battery, indemnification, liability based on *respondeat superior*, liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and unconstitutional search with respect to the Officers' entry onto the property where Mendez resided. (Defendants' Joint Motion for Summary Judgment ("Defs.' Mot.") (Dkt. No. 208); Defendants' Joint Memorandum in Support of Their Motion for Summary Judgment ("Defs.' Mem.") (Dkt. No. 210).)[1] Mendez cross-moves for summary judgment on his unconstitutional search claim. (Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Mot.") (Dkt. No. 211); Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Mem.")

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

(Dkt. No. 213).)  For the following reasons, Defendants' motion is granted in part and denied in part, and Mendez's motion is denied in its entirety.

## FACTUAL BACKGROUND

We take the following facts from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case.  All facts are genuinely undisputed unless otherwise noted.[3]

---

[2] *See* Defendants' Joint Local Rule 56.1(a)(3) Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Defs.' SOF") (Dkt. No. 209); Plaintiff's Local Rule 56.1(a)(3) Statement of Material Facts as to Which There is No Genuine Issue ("Pl.'s SOF") (Dkt. No. 212); Plaintiff's Local Rule 56.1(b)(3) Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Resp. to Defs.' SOF") (Dkt. No. 237) at 1–27; Plaintiff's Local Rule 56.1(b)(3)(c) Statement of Additional Facts Requiring the Denial of Defendants' Motion for Summary Judgment ("Pl.'s SOAF") (Dkt. No. 237) at 27–32; Defendants' Response to Plaintiff's Statement of Additional Facts Pursuant to Local Rule 56.1(b)(3)(c) ("Defs.' Resp. to Pl.'s SOAF") (Dkt. No. 240); Defendants' Joint Response to Plaintiff's Local Rule 56.1(a)(3) Statement of Material Facts ("Defs.' Resp. to Pl.'s SOF") (Dkt. No. 249); Defendants' Joint Local Rule 56.1(b)(3) Statement of Undisputed Additional Material Facts in Response to Plaintiff's Motion for Summary Judgment ("Defs.' SOAF") (Dkt. No. 250); Plaintiff's Response to Dkt. No. 250, Defendants' Statement of Additional Facts in Response to Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Resp. to Defs.' SOAF") (Dkt. No. 254).

[3] Defendants ask us to deem their Local Rule 56.1(a) statement of undisputed material facts admitted because Mendez's responses do not comply with Local Rule 56.1.  (Defendants' Joint Reply in Support of Summary Judgment ("Defs.' Reply") (Dkt. No. 241) at 2.)  According to Defendants, several of Mendez's responses deny facts without any record support, misstate or mischaracterize evidence, include irrelevant information that does not contradict the stated facts, and/or make improper factual and legal arguments.  (*Id.* at 3–4.)  Defendants also ask us to strike Mendez's Local Rule 56.1(b)(3) statement of additional facts in its entirety for failure to comply with Local Rule 56.1.  (*Id.* at 4; Defs.' Resp. to Pl.'s SOAF at 2.)  Defendants assert that several of Mendez's additional facts misstate or mischaracterize evidence, directly contradict the video evidence, are immaterial, are not "additional" facts because they are similar to facts already put forth by Defendants, are legal conclusions, and/or are argumentative.  (Defs.' Reply at 4–5; Defs.' Resp. to Pl.'s SOAF at 1–2.)

Many of Defendants' complaints are well-taken; Mendez's statements of fact and responses to Defendants' statements of fact too often failed to comply with Local Rule 56.1 and case law interpreting this rule.  But the same is true for Defendants' Local Rule 56.1 submissions.  Several of Defendants' responses to Mendez's proposed facts fail to admit facts that are supported by the cited evidence, identify evidence and make assertions that do not address the fact proposed by

The relevant events occurred on May 26, 2018. At this time, Mendez was 33 years old and lived in a building (the "Building") located at 5239 West Ohio Street in Chicago, Illinois (the "Property"). (Pl.'s Resp. to Defs.' SOF ¶¶ 5, 8; Transcript of Juan Mendez's Deposition ("Mendez Dep.") (Dkt. No. 209-2) at 24:19–22.) Below is a front view of the Building and the Property as of May 26, 2018:



---

Mendez, and inject improper arguments and objections. In short, both sides' Local Rule 56.1 submissions complicated our task in resolving their summary judgment motions instead of simplifying it. *See Vichio v. US Foods, Inc.*, No. 18 C 8063, 2022 WL 45028, at *3 (N.D. Ill. Jan. 5, 2022) ("Local Rule 56.1 is intended to simplify matters and make the court's job easier[.]" (quotation marks omitted)). Ultimately, though, we decline to strike any statement or response for noncompliance with Local Rule 56.1. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (leaving it to the district court's discretion to overlook any transgressions of the Local Rules so long as it does so equally for all parties). That said, we have not relied upon any fact proposed by either side unless the fact is supported by the cited evidence or the other side has admitted that the fact is undisputed. We also have not found any supported fact disputed unless the evidence cited by the opponent creates a *genuine* dispute.

(Declaration of Filiberto Mendez-Anglada ("Mendez-Anglada Decl.") (Dkt. No. 209-4) ¶ 10 & Ex. A.)

The Property had a front yard, which was enclosed by a short wrought-iron fence that people could see through and over. (*Id.* ¶¶ 8, 10, & Ex. A; Pl.'s Resp. to Defs.' SOF ¶ 14.) The fence had a gate, but the gate was not locked and could be opened without a key. (Mendez-Anglada Decl. ¶ 9 & Ex. A; Pl.'s Resp. to Defs.' SOF ¶ 14.) The Building had a front door, a porch off the front door, and steps leading up to the front porch. (Mendez-Anglada Decl. ¶ 10 & Ex. A.) Inside, the Building consisted of one apartment unit on the first floor and another apartment unit on the second floor. (*Id.* ¶ 4.) Both units had access to the front porch and front yard. (*Id.* ¶ 7.)

In May 2018, the Building's owner rented out both units. (*Id.* ¶¶ 3, 5.) Members of Mendez's family lived in both units: Mendez lived in the second-floor unit with his father, his father's wife, and a brother; Mendez's half-brother, Juan Mendez, Jr., lived in the first-floor unit with his wife and children. (Defs.' Resp. to Pl.'s SOF ¶ 17; Mendez Dep. at 24:13–27:6; Transcript of Juan Mendez, Jr.'s Deposition ("Mendez Jr. Dep.") (Dkt. No. 212-13) at 16:11–13, 17:22–18:6.) Mendez's name was not on the lease. (Pl.'s Resp. to Defs.' SOF ¶ 9.) The members of Mendez's family who lived in the Building left the doors to both units unlocked, and they could freely access both units. (Defs.' Resp. to Pl.'s SOF ¶¶ 17, 18; Mendez, Jr. Dep. at 31:10–32:6, 99:24–100:20.) The entire family also used the front yard and front porch. (Mendez, Jr. Dep. at 35:9–12, 37:17–24.) Mendez, Jr. testified that the front gate was always closed shut. (Defs.' Resp. to Pl.'s SOF ¶ 19.) Mendez, Jr. further testified that he considered the front yard private property for his family's exclusive use and that he would call the police if he saw someone loitering in the front yard. (*Id.* ¶¶ 20, 21; Mendez, Jr. Dep. at 102:6–8, 102:18–

4

103:3, 104:23–105:2.) Even so, visitors would walk up the stairs to the porch and either call out for the person they were visiting or knock on the front door. (Mendez, Jr. Dep. at 90:10–91:5.) Delivery persons also left packages for members of the Mendez family on the front porch. (*Id.* at 33:20–34:6, 90:6–9.)

In the early morning hours of May 26, 2018, Mendez discharged a handgun outside the Building. (Pl.'s Resp. to Defs.' SOF ¶ 15; Mendez Dep. at 64:13–65:13, 177:24–178:6.) The Chicago Police Department's ("CPD") ShotSpotter technology[4] detected the gunfire, and the Office of Emergency Management and Communications broadcast over zone radio that a shot had been fired in the area of 5235 West Ohio Street. (Pl.'s Resp. to Defs.' SOF ¶¶ 16–18, 23.) Chicago police officers are aware that a ShotSpotter alert covers an area of "82 feet from the epicenter, which means that the gunfire could have originated up to two houses away on either side of a designated location." (Defs.' Resp. to Pl.'s ASOF ¶ 100.)

Szczur and Cook were Chicago police officers assigned to the CPD's 015 District. (Pl.'s Resp. to Defs.' SOF ¶¶ 6, 21.) The 015 District, which is located on Chicago's west side in the Austin neighborhood, is known for high gang activity. (*Id.* ¶¶ 10, 11.) While patrolling the district, Szczur, Cook, and two other police officers heard the radio dispatch of a shot fired in the

---

[4] The Seventh Circuit has described ShotSpotter as follows:

> ShotSpotter is a surveillance system that uses sophisticated microphones to record gunshots in a specific area. After a device detects the sound of gunfire, it relays the audio file to a server in California, where an individual determines whether the sound is a shot. When that individual confirms the sound is a gunshot, ShotSpotter sends it back to the local police department.

*United States v. Rickmon*, 952 F.3d 876, 878–79 (7th Cir. 2020). Sounds other than gunfire, such as the sound of fireworks, a truck backfire, road construction, or an "L" train, may at times trigger a ShotSpotter alert. (Defs.' Resp. to Pl.'s SOF ¶¶ 3, 4; Transcript of Jeffrey Allen's Deposition ("Allen Dep.") (Dkt. No. 212-2) at 85:7–16.)

vicinity of 5235 West Ohio Street. (*Id.* ¶¶ 21, 23.) The officers responded and arrived in the area of that address approximately two minutes after the dispatch. (*Id.* ¶¶ 23, 24; Defs.' Resp. to Pl.'s SOF ¶ 6.) Each officer was dressed in full police uniform, with a vest labeled "POLICE"; had his police star displayed and visible on his uniform; and was equipped with a body-worn camera. (Pl.'s Resp. to Defs.' SOF ¶ 22; Defs.' Resp. to Pl.'s SOF ¶ 7.) At all relevant times, Szczur and Cook were acting within their scope of employment and under color of law. (Pl.'s Resp. to Defs.' SOF ¶ 6.)

When the officers arrived at the scene, Mendez was sitting on the Building's front porch, and a juvenile was sitting on the porch steps. (*Id.* ¶ 27; Defs.' Resp. to Pl.'s SOAF ¶ 79.) Mendez and the juvenile were the only individuals other than police officers that Szczur and Cook saw outside in the area. (Transcript of Christian Szczur's Deposition ("Szczur Dep.") (Dkt. No. 209-6) at 117:18–118:4, 119:5–17; Transcript of David Cook's Deposition ("Cook Dep.") (Dkt. No. 209-7) at 116:8–20, 141:20–142:6.) While sitting on the porch, Mendez's handgun was tucked into the right side of his waistband, near his right buttock. (Pl.'s Resp. to Defs.' SOF ¶ 66; Mendez Dep. at 94:6–12.)

After arriving at the scene, the officers exited their vehicle. (Statement of David Cook to the Civilian Office of Police Accountability ("Cook COPA Statement") (Dkt. No. 212-14) at 16:1–7.) Cook noticed two individuals—Mendez and the juvenile—and made his way to the Property, which is two lots west of 5235 West Ohio Street. (*Id.* at 16:1–11; Cook Dep. at 116:8–10; Szczur Dep. at 75:17–21.) Cook then stood on the sidewalk in front of the Property's fence gate and began talking to Mendez and the juvenile. (Defs.' Resp. to Pl.'s SOF ¶ 32; Cook COPA Statement at 16:7–18; Cook Dep. at 117:17–23; Cook Video at 0:00–0:10; Szczur Video at 1:08–

6

1:22.)[5]  A short time later, Szczur, who had been investigating the front yard of 5235 West Ohio Street, walked to the Property.  (Szczur Video at 0:19–1:22.)  Mendez recognized Cook and Szczur to be Chicago police officers.  (Pl.'s Resp. to Defs.' SOF ¶ 65; Mendez Dep. at 94:13–95:3.)

Upon arriving at the Property, Szczur asked "you guys don't have anything on you you're not supposed to have, right?," pushed the gate open, told Mendez and the juvenile to stand up, and entered the front yard.  (Szczur Video at 1:23–1:27; Pl.'s Resp. to Defs.' SOF ¶¶ 29, 30; Defs.' Resp. to Pl.'s SOF ¶ 38; Defs.' Resp. to Pl.'s SOAF ¶ 101.)  Mendez did not verbally respond to Szczur's question or immediately stand up.  (Szczur Video at 1:24–1:30; Cook Video at 0:11–0:20; Mendez Dep. at 96:14–97:1.)  Szczur then approached the front porch stairs and instructed the juvenile to walk to Cook, who had entered the yard behind Szczur.  (Szczur Video at 1:27–1:31; Cook Video at 0:14–0:20; Defs.' Resp. to Pl.'s SOAF ¶ 101.)  After the juvenile complied with Szczur's instructions, Cook began to pat him down.  (Cook Video at 0:16–0:23; Pl.'s Resp. to Defs.' SOF ¶ 34; Defs.' Resp. to Pl.'s SOF ¶ 43.)  Meanwhile, Szczur began walking up the porch stairs.  (Szczur Video at 1:30–1:36; Pl.'s Resp. to Defs.' SOF ¶ 35.)  Mendez stood up, but once Szczur got closer, Mendez jumped off the porch before Szczur could come "to touch and grab" him.  (Szczur Video at 1:34–1:37; Cook Video at 0:20–0:23; Pl.'s Resp. to Defs.' SOF ¶ 35; Mendez Dep. at 97:8–17.)  After landing in the adjoining yard,

---

[5] "Cook Video" represents the video footage from Cook's bodycam that Defendants produced at FCRL000148, and "Szczur Video" represents the video footage from Szczur's bodycam that Defendants produced at FCRL000144.  (Defs.' Resp. to Pl.'s SOF ¶ 9; Declaration of David Cook ("Cook Decl.") (Dkt. No. 209-10) ¶ 1; Declaration of Christian Szczur ("Szczur Decl.") (Dkt. No. 209-8) ¶ 1.)  Mendez filed these videos as digital exhibits at docket numbers 216 and 217.  Defendants filed shortened versions of the videos as digital exhibits at docket numbers 214 and 215.  The authenticity of the Cook Video and the Szczur Video is not in genuine dispute, and both sides have relied extensively upon these videos for their statements of fact and summary judgment arguments.

Mendez crossed the yard, jumped over a fence, and began running down a nearby alley. (Szczur Video at 1:37–1:38; Pl.'s Resp. to Defs.' SOF ¶ 35; Mendez Dep. at 98:21–99:6, 99:11–100:13, 101:9–102:5.) Mendez's gun was in his waistband when he jumped off the porch and began running down the alley. (Pl.'s Resp. to Defs.' SOF ¶¶ 66, 67; Mendez Dep. at 103:1–11.)

Szczur and Cook gave chase. (Szczur Video at 1:37–1:43; Cook Video at 0:21–0:29; Pl.'s Resp. to Defs.' SOF ¶ 37.) Just before he entered the alley, Szczur yelled "Put your fucking hands up," "I'll shoot you," "I'll fucking shoot you." (Szczur Video at 1:42–1:45.) At this point, Szczur had not yet observed a gun in Mendez's hands. (Defs.' Resp. to Pl.'s SOAF ¶ 97.) After entering the alley, Cook, who was ahead of Szczur, yelled "Waistband," "Waistband," "Waistband," "Get your hands up," and "Hands up" in quick succession. (Cook Video at 0:29–0:35.) Szczur heard Cook yell "Waistband," "Waistband," "Waistband," which he interpreted to mean that Mendez may have a weapon in his waistband. (Szczur Dep. at 124:22–126:2.) While running, Mendez did not put his hands in the air in response to the Officers' commands. (Mendez Dep. at 106:10–107:5.)

Immediately after yelling "Hands up," Cook shouted "He's got it in his hands," which Szczur testified alerted him "to the fact that [Mendez] had a firearm in his hand." (Cook Video at 0:35–0:36; Szczur Dep. at 127:5–11.) Mendez fell around the same time Cook shouted "He's got it in his hands." (Cook Video at 0:35–0:36; Pl.'s Resp. to Defs.' SOF ¶ 43; Cook Dep. at 243:21–244:11, 282:23–283:3.) At that point, the Officers were "really close" to Mendez. (Mendez Dep. at 111:4–18.) Mendez got back up and continued to run, looking back over his right shoulder to see where the Officers were. (Cook Video at 0:36–0:38; Mendez Dep. at 111:4–112:2, 189:10–190:15, 195:1–4.) In doing so, his right hand and arm swung in the

Officers' direction. (Cook Video at 0:37–0:38.) Cook's bodycam footage shows that Mendez was holding something in his right hand. (*Id.*)

At this point, Szczur ran ahead of Cook and yelled "I'll shoot you." (Szczur Video at 1:51–1:52; Cook Video at 0:38–0:40; Pl.'s Resp. to Defs.' SOF ¶¶ 48, 53.) Within a second of yelling "I'll shoot you," Szczur fired three shots. (Szczur Video at 1:52–1:53; Cook Video at 0:39–0:40; Pl.'s Resp. to Defs.' SOF ¶¶ 49, 53, 54, 58.) One bullet struck Mendez in his right shoulder and the other two bullets struck Mendez in his lower back. (Mendez Dep. at 161:6–16.) Only 18 seconds elapsed between Mendez's leap off the porch and Szczur's third and final shot. (Pl.'s Resp. to Defs.' SOF ¶ 60.)

After Szczur's third shot, Mendez fell to the ground. (Pl.'s Resp. to Defs.' SOF ¶ 51.) His gun landed approximately 10 feet in front of him. (*Id.* ¶¶ 51, 55.) While on the ground, Mendez said "I wasn't going to shoot." (*Id.* ¶ 59; Cook Video at 00:48.) As a result of the shooting, Mendez is paralyzed from the waist down. (Mendez Dep. at 159:20–160:12, 162:8–11.)

The parties dispute whether Mendez pointed a gun at the Officers before Szczur shot him. Cook testified that he yelled "He's got it in his hands" because he saw a gun in Mendez's right hand. (Cook Dep. at 271:9–16, 272:11–20.) Cook further contends that Mendez pointed a firearm in his and Szczur's direction at timestamp 0:38 of his bodycam video, which is shortly after Mendez got up after falling the first time. (Cook Decl. ¶ 5; Cook Video at 0:36–0:38.) Szczur claims that Mendez began to raise a firearm in his direction at timestamp 1:52 of his bodycam video and that he shot Mendez less than one second later, while Mendez was pointing the firearm in his and Cook's direction. (Szczur Decl. ¶¶ 4, 5.) Szczur says he fired his weapon while in fear for his and Cook's lives and until he felt the threat was gone. (*Id.* ¶¶ 5–7; Szczur

Dep. at 174:18–175:1.)  According to Mendez, however, the gun remained in his waistband until he fell to the ground after being shot, and he never placed his hand on the gun at any point during the chase.  (Pl.'s Resp. to Defs.' SOF ¶¶ 66, 67; Mendez Dep. at 107:6–8, 109:6–19, 136:15–18, 195:7–11, 196:18–197:15.)

## PROCEDURAL HISTORY

Mendez filed suit in September 2018.  (Dkt. No. 1.)  After a number of amended complaints and rulings on motions to dismiss and strike, the following claims remain:

- a Fourth Amendment excessive force claim against Szczur (Count I);

- a *Monell* claim against the City regarding the unreasonable and excessive use of force (Count V);

- a battery claim under Illinois law against Szczur (Count VI);

- a claim seeking indemnification from the City for Szczur's actions (Count VII);

- a claim seeking to hold the City liable for the Officers' actions based on the doctrine of *respondeat superior* (Count VIII); and

- a Fourth Amendment unreasonable search claim against the Officers based on their entry onto the Property and their initiation of an investigatory stop (Count IX).

(*See* Plaintiff's Third Amended Complaint at Law ("3AC") (Dkt. No. 91); Dkt. Nos. 73, 107, 243; Pl.'s Resp. to Defs.' SOF ¶ 1.)  With respect to Mendez's *Monell* claim, which is based on Szczur's use of force, the parties have stipulated that the City will consent to a judgment against it for compensatory damages and, to the extent allowed, reasonable attorneys' fees, if Szczur is found to have used excessive force in shooting Mendez.  (Stipulation as to Plaintiff's *Monell* Claim Against Defendant City of Chicago ("*Monell* Stipulation") (Dkt. No. 207) ¶¶ 2, 4–6.)  The parties have also agreed that a finding that Szczur did not use excessive force will warrant entering judgment in the City's favor on the *Monell* claim.  (Agreed Motion for Entry of

Stipulation as to Plaintiff's *Monell* Claim against Defendant City of Chicago ("Mot. for *Monell* Stipulation") (Dkt. No. 203) ¶ 3.) We have jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## LEGAL STANDARD

Summary judgment is appropriate "where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). Where both sides move for summary judgment, we construe the evidence and draw "all reasonable inferences in favor of the [side] against whom the motion at issue [is] made." *Chi. Tchrs. Union v. Bd. of Educ. of the City of Chi.*, 14 F.4th 650, 654 (7th Cir. 2021) (quotation marks omitted); *Jefferson v. United States*, 546 F.3d 477, 480 (7th Cir. 2008). "To defeat summary judgment, a party must present a 'genuine dispute' of material fact such that a reasonable jury could find in its favor." *PMT Mach. Sales, Inc. v. Yama Seiki USA, Inc.*, 941 F.3d 325, 328 (7th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).

"On summary judgment we do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). "We have one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (quotation marks omitted). Because video footage from the Officers' bodycams is in the record, however, we may consider this footage without favoring the non-moving side if it "clearly contradicts" the non-moving side's claims. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). "This is because on summary judgment we view the facts in the light most favorable to the nonmovant only if there is a genuine dispute about those facts." *Id.* "When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage." *Id.*

11

**ANALYSIS**

The Fourth Amendment is at the center of this case. The Fourth Amendment, as applied to the states through the Fourteenth Amendment, prohibits the government from conducting "unreasonable searches and seizures" of "persons, houses, papers, and effects." U.S. Const. amend. IV; *United States v. Henderson*, 748 F.3d 788, 790 (7th Cir. 2014). Mendez argues that the Officers' actions on May 26, 2018, violated the Fourth Amendment's prohibition against unreasonable searches. Mendez also argues that the shooting constituted an unreasonable seizure in violation of the Fourth Amendment, as well as civil battery under Illinois law. Finally, Mendez seeks to hold the City responsible for the Officers' actions under various theories of liability.

Both sides have moved for summary judgment. Mendez argues that he is entitled to summary judgment on his unreasonable search claim based on two theories: (1) that the Officers conducted an unreasonable search when they initiated a *Terry* stop without legal justification; and (2) that the Officers conducted an unreasonable search when they entered the Property without legal justification. (Pl.'s Mot. at 1; Pl.'s Mem. at 6–7.) Defendants seek summary judgment on Mendez's (1) unreasonable search claim against the Officers based on the unlawful entry theory; (2) excessive force claim against Szczur; (3) civil battery claim against Szczur; (4) *Monell* claim against the City; (5) indemnification claim against the City; and (6) claim seeking to hold the City liable for the Officers' actions based on the doctrine of *respondeat superior*. (Defs.' Mot. at 1; Defs.' Mem. at 24–25.) Defendants' summary judgment motion does not challenge Mendez's *Terry*-based unreasonable search theory (*see generally* Defs.' Mem.), and we previously denied the Officers' request for leave to file a second summary judgment motion to address it. (Dkt. No. 243 at 6–7.) We tackle Mendez's motion before proceeding to Defendants' motion.

I.      **Mendez's Motion for Partial Summary Judgment**

In addressing Mendez's summary judgment motion, we construe the evidence and draw all reasonable inferences in Defendants' favor. *Jefferson*, 546 F.3d at 480. Moreover, because Mendez bears the burden of proof on his unreasonable search claim, *Martinez v. City of Chicago*, 900 F.3d 838, 846 (7th Cir. 2018), he "must lay out the elements of the claim, cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of [Defendants] on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). If Mendez does not make this showing, we must deny his motion for summary judgment. *Id.*

Mendez brings his unreasonable search claim under 42 U.S.C. § 1983. (*See* 3AC, Count IX.) "To prevail on a § 1983 claim, the plaintiff must prove that (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law." *First Midwest Bank ex rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (quotation marks omitted). Defendants assert in their own summary judgment filings that the Officers were acting within the scope of their employment and under color of law (Defs.' SOF ¶ 6), so we deem the second element satisfied. The only question is whether Mendez has established, beyond dispute, that the Officers' actions violated the Fourth Amendment's prohibition against unreasonable searches based on his *Terry* stop theory or his unlawful entry theory.

To determine whether the Officers violated Mendez's Fourth Amendment rights under either theory, we first ask if the actions at issue constituted a search. *See United States v. Correa*, 908 F.3d 208, 217 (7th Cir. 2018). "The Supreme Court uses two analytical approaches to decide whether a search has occurred": a "property-based or trespass approach" and an approach "based on expectations of privacy." *Id.* A search has occurred if either approach is

13

satisfied. *See id.*; *United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016). If a search occurred, we next ask if the search was reasonable. *Correa*, 908 F.3d at 217. If the search was not reasonable, the Officers violated Mendez's Fourth Amendment rights. *See* U.S. Const. amend. IV; *Henderson*, 748 F.3d at 790.

### A.   *Terry* **Stop**

We start with Mendez's argument that he is entitled to summary judgment because the Officers initiated an unjustified *Terry* stop. (Pl.'s Mem. at 7–15.) Under the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), "law enforcement officers may conduct brief investigatory stops if they have reasonable suspicion that a person is engaged in criminal activity." *United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022). An investigative stop under *Terry* can involve two stages. *United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000). The first stage is the actual stop itself, where an officer briefly detains an individual and asks questions for investigative purposes. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Eymann*, 962 F.3d 273, 285 (7th Cir. 2020); *Brown*, 232 F.3d at 592. This stop constitutes a seizure. *United States v. Watson*, No. 19 CR 329, 2021 WL 3666435, at *6 (N.D. Ill. Aug. 18, 2021); *United States v. Eymann*, No. 3:15-cr-30021, 2016 WL 5842251, at *4 (C.D. Ill. Oct. 5, 2016), *aff'd*, 962 F.3d 273 (7th Cir. 2020); *see also United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021) ("Stopping someone is generally considered a seizure[.]"). The second stage is a protective search for weapons. *See United States v. Richmond*, 924 F.3d 404, 413–14 (7th Cir. 2019); *Brown*, 232 F.3d at 592. This may be carried out as a "frisk"—where the officer pats down the individual's "outer clothing to search for weapons"—or as a search of the area within the individual's control. *United States v. Howell*, 958 F.3d 589, 598 (7th Cir. 2020); *Richmond*, 924 F.3d at 413–14.

According to Mendez, Cook initiated a *Terry* stop when he began talking to Mendez, and Szczur continued the *Terry* stop when he issued orders to Mendez and approached him.[6] (Pl.'s Mem. at 4–5, 9–12.) This *Terry* stop, Mendez continues, was not legally justified. (*Id.* at 12–15.) Thus, Mendez concludes, he was subjected to an unreasonable search that violated his Fourth Amendment rights. (*Id.* at 7–8.)

Mendez's argument fails. For one thing, Mendez cannot establish an unreasonable search based on an allegedly unreasonable seizure that did not occur. We have already ruled that Mendez was not seized until he was shot. (Dkt. No. 73 at 10–11; Dkt. No. 107 at 2–3.) Consequently, the Officers' actions prior to Mendez's flight cannot constitute a *Terry* stop, which is a particular type of seizure.

Moreover, Mendez improperly conflates an investigative *stop* with a *search*. Seizures and searches are "distinct governmental encroachments," *United States v. Brown*, 79 F.3d 1499, 1508 (7th Cir. 1996), and the "stop" aspect of a *Terry* stop is distinct from any "search" that may also occur. *See, e.g.*, *Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016) (characterizing the investigatory stop and the *Terry* frisk at issue as "distinct Fourth Amendment intrusion[s]"); *United States v. Carstarphen*, 298 F. App'x 151, 154 (3d Cir. 2008) ("We evaluate a *Terry* stop and frisk as two independent actions, each requiring separate justifications." (quotation marks omitted)); *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987) ("[A] stop and a frisk . . . while frequently occurring in conjunction, are actually separate activities[.]"); *United States v. Williams*, No. 12-cr-54-wmc, 2012 WL 12887734, at *4 (W.D. Wis. Sept. 12, 2012) ("the

---

[6] We consider the Officers' actions as they relate to Mendez only; whether the Officers unreasonably searched the juvenile, who is not a plaintiff in this case, is not at issue. *See United States v. Rodriguez-Escalera*, 884 F.3d 661, 667 (7th Cir. 2018) ("The Fourth Amendment's protections are personal rights that may not be vicariously asserted." (quotation marks omitted)).

actual investigative stop" and the "protective pat-down search" are "two distinct stages" of a *Terry* stop); *People v. Powell*, 224 Ill. App. 3d 127, 136 (1st Dist. 1991) (*Terry* requires the stop and search of an individual to be considered "as two separate and independent acts"). Nor does the initiation of a *Terry* stop mean that a search will necessarily occur. *See, e.g.*, *United States v. Carlisle*, 614 F.3d 750, 754–55 (7th Cir. 2010) ("During the [*Terry*] stop, the officer *may* conduct a pat-down search[.]" (emphasis added)); *Bonds*, 829 F.2d at 1074 (explaining that although a stop and a frisk frequently occur together, a frisk "does not always result from, nor is it necessarily a part of," a stop). Mendez admits as much when he acknowledges that "[n]ot all *Terry* stops involve pat-downs or frisks." (Reply in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Reply") (Dkt. No. 253) at 3.)

Mendez nonetheless asserts that "*Terry* stops necessarily involve the intertwining, sometimes inextricably, of searches and seizures." (*Id.* at 5.) For this assertion, Mendez cites *Bailey v. United States*, 568 U.S. 186 (2013), where the Supreme Court stated that "[a] search or seizure may occur singly or in combination." 568 U.S. at 189. In making this observation, though, *Bailey* did not suggest that a search and a seizure are one and the same; it merely recognized that a search and a seizure can accompany each other, *i.e.*, they can be carried out *in combination* with each other. Mendez also resists the distinction between seizures and searches by arguing that whether Szczur's conduct "is characterized as a search or a seizure or a combination of the two is beside the point, and risks missing the forest for the trees." (Pl.'s Reply at 7.) But we have already ruled that no seizure took place until Mendez was shot, so the Fourth Amendment claim at issue can only succeed if there was an unreasonable search. Thus, the characterization of the Officers' conduct as a search or a seizure is an important one.

Mendez's contention that the Officers' alleged *Terry* stop constituted an unreasonable search is factually and legally unfounded. To prove that the Officers unreasonably searched him based on *Terry*, Mendez must show that the Officers' actions constituted (1) a search of his person that was (2) not justified under *Terry*. *See Correa*, 908 F.3d at 217; *see also Richmond*, 924 F.3d at 413 (determining whether a search exceeded the permissible scope of *Terry* without determining whether a *Terry* stop preceded the search). And in seeking summary judgment on this claim, it is Mendez's burden to cite the facts that purportedly show a search that was not justified under *Terry* "and demonstrate why the record is so one-sided as" to preclude a contrary finding. *Hotel 71 Mezz Lender*, 778 F.3d at 601.

Mendez has not met this burden. Mendez fails to explain in his opening memorandum how the Officers' actions constituted a search under either the property-based or the privacy-based approach. (*See* Pl.'s Mem. at 7–12.) Instead, Mendez relies solely on his contention that a *Terry* stop constitutes a search (*id.*), which we have rejected. Mendez argues for the first time in his reply that Szczur carried out a search "when he physically intruded upon [Mendez's] property and into his personal space in order to obtain information" (Pl.'s Reply at 6), but this is too late to meet his summary judgment burden. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[D]istrict courts are entitled to treat an argument raised for the first time in a reply brief as waived."); *Guyton v. Taybron*, No. 18 C 1856, 2020 WL 1027886, at *2 (N.D. Ill. Mar. 3, 2020) (defendants waived arguments for summary judgment that were not raised in their initial memorandum); *Ores v. Willow W. Condo. Ass'n*, No. 94 C 4717, 1998 WL 852839, at *10 (N.D. Ill. Nov. 30, 1998) (denial raised by summary judgment movants for the time in their reply came "too late for them to meet their summary judgment burden"). We therefore deny Mendez's motion for summary judgment on his *Terry*-based unreasonable search theory.

Given Defendants' failure to move for summary judgment on Mendez's *Terry*-based unreasonable search theory, this denial ordinarily would mean that the parties must proceed to trial on this theory. *See Hotel 71 Mezz Lender*, 778 F.3d at 602–03. Defendants, however, assert that we should grant summary judgment in their favor on this theory because there is no evidence that the Officers ever searched Mendez's person. (Defendants' Joint Response in Opposition to Plaintiff's Partial Motion for Summary Judgment ("Defs.' Opp'n") (Dkt. No. 252) at 7–8.) We may do so, but only if we first give Mendez "notice of that possibility and a reasonable opportunity to respond," including "the chance to marshal evidence and argument in opposition to summary judgment." Fed. R. Civ. P. 56(f)(1); *Hotel 71 Mezz Lender*, 778 F.3d at 603. Mendez's rejoinder is that we should strike Defendants' request for summary judgment, which he says violates our previous order denying the Officers' request for leave to file a summary judgment motion that addressed the *Terry*-based unreasonable search theory. (Pl.'s Reply at 1.)

In their request to file another summary judgment motion, the Officers did not explain how their failure to address Mendez's *Terry*-based unreasonable search theory was the result of "excusable neglect," and we "decline[d] to invite another round of summary judgment briefing based on the Officers' undeveloped request." (Dkt. No. 243 at 7.) But we did so *before* we had the opportunity to evaluate all the evidence and arguments presented by both sides on Mendez's *Terry*-based theory. (*See* Dkt. No. 226 (continuing the deadlines for Defendants' response to Mendez's summary judgment motion and Mendez's reply until after our ruling on the Officers' request for leave to file another summary judgment motion).) Now that we have evaluated the evidence and arguments, we question whether a reasonable jury could find that any of the Officers' actions constituted a search of Mendez's person. Indeed, Mendez does not even argue that Cook searched him even after Defendants raised the issue in their opposition. (*See* Defs.'

Opp'n at 7–8; Pl.'s Reply at 5–7.)  In view of our resolution of Mendez's other claims, the necessity of a trial will depend on whether a reasonable jury could find that either Officer unreasonably searched Mendez under *Terry*.  Thus, we find it appropriate to consider whether summary judgment for Defendants on this single issue is warranted.  *See Simkus v. Cavalry Portfolio Servs., LLC*, 12 F. Supp. 3d 1103, 1113 (N.D. Ill. 2014) (invoking Rule 56(f) to require the parties to file supplemental briefs on an issue not raised by the defendants at summary judgment "[b]ecause resolution of this question [might] narrow the issues remaining for trial").

Accordingly, this opinion serves as notice that we are considering whether to grant summary judgment in Defendants' favor on Mendez's *Terry*-based unreasonable search theory. Mendez has 28 days from entry of this opinion to file a brief of no more than 15 pages demonstrating that, based on the evidence in the record and the applicable law, a reasonable jury could find (1) that the Officers searched him; and (2) that the search was unreasonable under *Terry*.  Defendants have 14 days to file a response brief, which is also limited to 15 pages.  No separate statements of fact should be filed.  To the extent the parties' arguments refer to evidentiary materials not already in the summary judgment record, the parties should include the materials as exhibits and set forth the corresponding undisputed or disputed statements of fact in the briefs themselves.

### B.     Unlawful Entry

We now turn to Mendez's contention that the Officers conducted an unreasonable search by unlawfully entering the Property.  (Pl.'s Mem. at 15–20.)  As with his other unreasonable search theory, Mendez "must lay out the elements" of this theory, "cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding" in Defendants' favor.  *Hotel 71 Mezz Lender*, 778 F.3d at 601.  If he does not, we must deny his motion for summary judgment on this theory.  *Id.*

19

We first ask whether the Officers' entry onto the Property constituted a search. *See Correa*, 908 F.3d at 217. As already noted, there are two approaches to determining whether a search has occurred: a "property-based or trespass approach" and an approach "based on expectations of privacy." *Id.* Mendez does not argue that the Officers' entry was a search under the property-based approach (*see* Pl.'s Mem. at 18–20), so we limit our analysis to whether the evidence undisputedly shows that the Officers' entry was a search under the privacy-based approach. Under this approach, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001); *United States v. Tuggle*, 4 F.4th 505, 512–13 (7th Cir. 2021). This test "has two required elements, one subjective (that is, dependent on what the plaintiff thinks) and one objective (that is, dependent on society's view)." *Flores v. Lackage*, 938 F. Supp. 2d 759, 767 (N.D. Ill. 2013); *see also Tuggle*, 4 F.4th at 513.

Mendez has failed to demonstrate that the Officers' entry onto the Property undisputedly satisfies both prongs of the privacy-based test. First, Mendez does not explain how the evidence is so one-sided that a jury would have to find that he subjectively had an expectation of privacy in the Property's front yard and the Building's front porch. Although Mendez asserts that he "expected that his home porch was sacrosanct," this assertion is unsupported by any evidence (Pl.'s Mem. at 20), and we do not consider it. *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("[A]ssertions in briefs are not evidence[.]"); *Boyce v. Obaisi*, No. 13 C 5746, 2015 WL 5462137, at *2 (N.D. Ill. Sept. 16, 2015) ("[U]nsupported statements in a legal brief are not evidence that the Court can consider at summary judgment."). Mendez also asserts that the Property's front yard "was considered private property[] for the exclusive use of the Mendez family." (Pl.'s Mem. at 19 (citing Pl.'s SOF ¶ 20).) This assertion is backed up by evidence, so

20

we have considered whether it undisputedly establishes Mendez's subjective expectation of privacy in the front yard. It does not. The supporting evidence is deposition testimony from Mendez's half-brother, Juan Mendez, Jr., who testified as follows:

> Q. Did you consider the front yard private property?
>
> A. Yes.
>
>                 *     *     *
>
> Q. Now, was this front property of your house [for] the exclusive use of members of the Mendez family, the extended Mendez family living in the home at 5239 West Ohio?
>
> A. Yes.

(Mendez, Jr. Dep. at 102:6–22 (cited by Pl.'s SOF ¶ 20).) Construing the evidence in the light most favorable to Defendants, this testimony reflects the beliefs of the witness (Mendez, Jr.), not of Mendez himself. Because Mendez has not identified evidence that conclusively establishes *his* subjective expectation of privacy in the front yard and front porch, he has not met his summary judgment burden with respect to the subjective element of the privacy-based approach.

Second and independently, Mendez has not shown that society would find his purported expectation of privacy in the front yard and front porch to be reasonable. Mendez contends that the Fourth Amendment's protection extends to a house's curtilage and that the Property's front yard and the Building's front porch are parts of the curtilage.[7] (Pl.'s Mem. at 18–20.) But even if the front yard and front porch constitute curtilage in this case, not all intrusions onto curtilage violate reasonable expectations of privacy. *See United States v. Shanks*, 97 F.3d 977, 979–80 (7th Cir. 1996) (explaining that "the mere intonation of curtilage" does not end the inquiry into

---

[7] A home's curtilage is the "the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002).

whether an individual has a reasonable expectation of privacy). "Even if the area searched . . . fell within the curtilage," the party asserting an unreasonable search "must still demonstrate a legitimate expectation of privacy." *United States v. Schmidt*, No. 11-CR-153, 2011 WL 5834235, at *3 (E.D. Wis. Nov. 21, 2011).

Mendez's opening memorandum, however, does not explain why his expectation of privacy in the porch "was objectively reasonable" under relevant legal authority. (Pl.'s Mem. at 20.) Mendez asserts in his reply that *United States v. King*, 227 F.3d 732, 749 (6th Cir. 2000), and *People v. Martin*, 2017 IL App (1st) 143255, ¶ 26 "acknowledge a person's right to privacy on his own front porch" (Pl.'s Reply at 12), but this assertion comes too late to satisfy his summary judgment burden. *See O'Neal*, 961 F.3d at 974; *Guyton*, 2020 WL 1027886, at *2; *Ores*, 1998 WL 852839, at *10. In any event, neither *King* nor *Martin* concluded that an individual has an objectively reasonable expectation to privacy in his front porch (or his front yard, for that matter). *See King*, 227 F.3d at 743–50 (addressing whether the defendant had a legitimate expectation of privacy in the basement area of a two-family dwelling); *Martin*, 2017 IL App (1st) 143255, ¶ 32 (declining to "decide whether the officers' conduct violated defendant's expectation of privacy"). Mendez has failed to meet his summary judgment burden on this element as well.

We therefore deny Mendez's motion for summary judgment on his unlawful entry theory. Although Defendants ask us to grant summary judgment in their favor on this theory under Rule 56(f)(1) as well (Defs.' Opp'n at 18), we decline to do so given Defendants' own motion for summary judgment on this theory.

*    *    *

In sum, we deny Mendez's motion for partial summary judgment in its entirety. Pursuant to Rule 56(f)(1), we further notify Mendez that we are considering whether to grant summary judgment in Defendants' favor on his *Terry*-based unreasonable search theory, and the parties shall brief the issue as detailed above.

## II.    Defendants' Motion for Summary Judgment

Next up is Defendants' summary judgment motion. For this motion, we construe the evidence and draw all reasonable inferences in Mendez's favor. *Jefferson*, 546 F.3d at 480.

### A.    Unlawful Entry

As just discussed, Mendez contends that the Officers conducted an unreasonable search by entering the Property without legal justification. Defendants argue that we should grant summary judgment in their favor on this theory for two reasons. First, Mendez does not have standing to challenge the Officers' entry into the Property's front yard because he had no reasonable expectation of privacy in the yard. (Defs.' Mem. at 21–22.) Second, the Officers are entitled to qualified immunity because they did not violate a clearly established right when they entered the front yard. (*Id.* at 23–24.)

We start—and end—our analysis with Defendants' assertion of qualified immunity. The doctrine of "[q]ualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (quotation marks omitted). Once a defendant invokes the doctrine of qualified immunity in a summary judgment motion, "the burden shifts to the plaintiff to defeat it." *Id.* (quotation marks omitted); *Est. of Davis v. Ortiz*, 987 F.3d 635, 638–39 (7th Cir. 2021). A plaintiff must make two showings to overcome a defendant's assertion of qualified immunity. *Gaddis v. DeMattei*, 30 F.4th 625, 632 (7th Cir. 2022). First, the plaintiff "must demonstrate that the facts,

when viewed in the light most favorable to him, establish a violation of his constitutional rights." *Id.* Second, the plaintiff must show that the alleged conduct "violated clearly established . . . constitutional rights of which a reasonable person would have known." *Id.* (quotation marks omitted). If the plaintiff does not make both showings, the defendant's "motion for summary judgment must be granted." *Est. of Davis*, 987 F.3d at 639; *see also Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) ("If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." (quotation marks omitted)). Whether a defendant is entitled to qualified immunity is a question of law for the court to decide. *Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021).

The Officers are entitled to qualified immunity on Mendez's unlawful entry theory because Mendez has not made either requisite showing. First, Mendez has not demonstrated that the Officers' entry onto the Property violated his Fourth Amendment rights. Police officers generally do not violate the Fourth Amendment by "tak[ing] actions that 'any private citizen might do,'" such as "walk[ing] up to any part of private property that is open to visitors or delivery people." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)); *United States v. Contreras*, 820 F.3d 255, 261 (7th Cir. 2016). This includes even entering a home's curtilage if the officers do so in a way that a delivery person or visitor would. *Davis v. Chalstrom*, 595 F. App'x 627, 630 (7th Cir. 2014) ("Many cases state that a government agent is permitted to enter the curtilage of the home in the same way that any delivery person or passerby could[.]"); *see also Jardines*, 569 U.S. at 8 (explaining that individuals have an implicit license to approach a "home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave").

Here, the Officers' actions in entering the Property were no different than the actions any private citizen might take. It is undisputed that the gate to the front yard was unlocked, and visitors and delivery people entered the Property's front yard through the gate and walked up the porch stairs to the front porch. (Pl.'s Resp. to Defs.' SOF ¶ 14; Mendez-Anglada Decl. ¶ 9; Mendez, Jr. Dep. at 33:20–34:6, 90:6–91:5, 92:5–12.) The Officers did no more in entering the Property than these private citizens would do. After entering the front yard through the unlocked gate, the Officers proceeded directly to the porch stairs. (Cook Video at 0:12–0:18; Szczur Video at 1:25–1:33.) Cook then situated himself at the bottom of the porch stairs, and Szczur walked up the porch stairs. (Cook Video at 0:18–0:23; Szczur Video at 1:33–1:36.) The Officers did not roam around the front yard or otherwise stray from the path to the stairs or the stairs themselves. (Cook Video at 0:12–0:26; Szczur Video at 1:25–1:40.) Nor did the Officers linger on the Property; their presence in the front yard lasted approximately 15 seconds. (Cook Video at 0:12–0:26; Szczur Video at 1:25–1:40.) Because the Officers entered the Property in the same way that visitors or delivery persons permissibly entered, their entry did not violate the Fourth Amendment's prohibition against unreasonable searches.

Arguing otherwise, Mendez contends that he had a subjective expectation of privacy to his curtilage that was reasonable. (Plaintiff's Response to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n") (Dkt. No. 236) at 23.) He asserts that the Building—despite having two apartment units—was akin to a single-family home and that the front yard was private property for the exclusive use of his family. (*Id.* at 23–24.) He also questions why the Officers entered the Property without first asking for permission or about the nature of the Building (e.g., was it a multi-family or multi-unit residence). (*Id.* at 24–25.)

Mendez's arguments are unpersuasive. Even if we treat the Building as a single-family home, assume the front yard is the home's curtilage, and accept Mendez's contention that he had a subjective expectation of privacy in the curtilage, he still must show that this expectation was objectively reasonable. *See Shanks*, 97 F.3d at 979–80; *Schmidt*, 2011 WL 5834235, at *3. And here, any expectation that individuals would not enter the Property as the Officers did was not objectively reasonable; the front gate was unlocked, and visitors and delivery people entered the Property through the front gate and proceeded up the porch stairs to the front porch. Nor does Mendez provide us with any basis to conclude that it is objectively unreasonable for visitors and delivery people to enter the Property without first asking for permission or inquiring into how many families live in the Building. The Officers entered the Property in the same way as these private citizens, so their entry did not infringe on an objectively reasonable expectation of privacy.

Second, Mendez has not shown that the Officers' entry onto the Property violated a clearly established Fourth Amendment right. "A right is clearly established where it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620 (7th Cir. 2022) (quotation marks omitted). A plaintiff may demonstrate a "clearly established" right in three ways: by (1) "identifying a closely analogous case finding the alleged violation unlawful"; (2) "identifying in the relevant case law such a clear trend . . . that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time"; or (3) arguing that the defendant's "conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully" even in the absence of analogous case law. *Id.* at 620–21 (quotation marks omitted); *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). It is the

plaintiff's burden to show that the defendant violated a "clearly established" right. *Reed*, 906 F.3d at 547.

Mendez's attempts to meet his burden come up short. He does not contend that a clear trend in the law establishes a clearly established right or that the Officers' conduct was so egregious and unreasonable that analogous cases are unnecessary, so the latter two avenues are not at issue. (*See* Pl.'s Opp'n at 29–31.) Rather, Mendez contends that "[i]t was clearly established long before May 26, 2018, that '[a] warrantless entry into a private home constitutes a search and presumptively is unreasonable under the Fourth Amendment.'" (*Id.* at 29 (quoting *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005)).) This is true enough, but this principle is much too general. *See Green*, 868 F.3d at 633 (explaining that the "clearly established law should not be defined at a high level of generality" (quotation marks omitted)). Indeed, the Supreme Court has held that a similar definition—"the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances"—lacked the degree of specificity required for the "clearly established" analysis in the Fourth Amendment context. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015). Furthermore, the Officers did not enter the Building itself, so the general rule regarding entry into a private home does not help Mendez for that reason as well. *See Green*, 868 F.3d at 633 (a case "must be particularized to the facts of the case" to constitute "clearly established" precedent (quotation marks omitted)); *see also United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) ("The area outside one's door lacks anything like the privacy of the area inside.").

Citing *Jardines*, Mendez also contends that "[w]arrantless entry onto curtilage violates the Fourth Amendment." (Pl.'s Opp'n at 29.) This purported legal principle is more specific,

and it is more applicable to the facts at hand, as the Officers arguably entered onto curtilage when they entered the Property's front yard, and Defendants do not contend that the Officers had a warrant to enter the Property.[8]  *See United States v. Sweeney*, 821 F.3d 893, 901 (7th Cir. 2016) (explaining that "a small fenced-in yard . . . [is] obviously part of the curtilage").  Yet not all warrantless entries onto curtilage violate the Fourth Amendment.  *Caniglia*, 141 S. Ct. at 1599; *see also Combs v. State*, 168 N.E.3d 985, 992 (Ind. 2021) ("[T]he curtilage is not impenetrable. So long as police do no more than any private citizen, their presence generally does not run afoul of the Fourth Amendment." (internal citation and quotation marks omitted)).  And by May 2018, it was clearly established that a police officer "may walk up to any part of private property that is otherwise open to visitors or delivery people."  *Contreras*, 820 F.3d at 261 (2016 opinion); *see also Davis*, 595 F. App'x at 630 (noting in a 2014 opinion that "[m]any cases state that a government agent is permitted to enter the curtilage of the home in the same way that any delivery person or passerby could").  In fact, *Jardines*—which issued more than five years before the events at issue—expressly recognized that police officers may enter a house's curtilage without a warrant if they approach the house in the same fashion as other private citizens.  569 U.S. at 8.  That is what the Officers did.  Thus, even if we assume that the Property's front yard constituted curtilage, *Jardines* does not clearly establish that the Officers' warrantless entry onto the Property violated the Fourth Amendment.

---

[8] That said, Mendez makes no attempt to identify evidence establishing that the Officers did not have a warrant; he simply says so without evidentiary support.  (Pl.'s Opp'n at 29.)  As already noted, unsupported assertions of fact in briefs are not evidence.  *Mitze*, 782 F.3d at 882; *Boyce*, 2015 WL 5462137, at *2.

Because Mendez has not made either showing required to defeat Defendants' assertion of qualified immunity, we grant summary judgment in Defendants' favor on Mendez's unconstitutional search claim as it relates to his unlawful entry theory.

### B. Excessive Force

Mendez also alleges that Szczur used excessive force in violation of the Fourth Amendment by shooting him. "A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). There is no question that by shooting Mendez, Szczur used deadly force to seize him. *See, e.g.*, *Torres v. Madrid*, 141 S. Ct. 989, 999 (2021) (shooting constituted a seizure); *Smith*, 10 F.4th at 729, 738–42 (analyzing the non-fatal shooting of a plaintiff as an application of deadly force). The question therefore is whether Szczur's use of deadly force was reasonable. *Horton*, 883 F.3d at 948 (use of deadly force "must be reasonable to be constitutional").

Defendants argue that we should grant summary judgment in their favor on Mendez's excessive force claim for two reasons. First, Defendants argue that Szczur did not violate Mendez's Fourth Amendment rights because his use of deadly force was objectively reasonable. (*See* Defs.' Mem. at 9–17.) This argument implicates the first prong of the qualified immunity analysis. *See Smith*, 10 F.4th at 736–38. Second, Defendants argue that Szczur's use of deadly force did not violate clearly established law. (Defs.' Mem. at 17–19.) This argument implicates the second prong of the qualified immunity analysis. *See Smith*, 10 F.4th at 737, 742. To defeat these arguments and survive summary judgment, Mendez must show both that (1) "the facts, when viewed in the light most favorable to him, establish" that the shooting constituted an unreasonable application of deadly force, and (2) that the shooting "violated clearly established

. . . constitutional rights of which a reasonable person would have known." *See Gaddis*, 30 F.4th at 632 (quotation marks omitted); *Est. of Davis*, 987 F.3d at 638–39.

### 1. Did the Shooting Violate Mendez's Fourth Amendment Rights?

We start with the first prong—was there a constitutional violation? "Excessive force claims, including deadly force claims, resulting from a seizure are analyzed under the Fourth Amendment's objective reasonableness standard." *Deering v. Reich*, 183 F.3d 645, 650 (7th Cir. 1999) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). Applying this standard, we ask whether an officer's actions were "objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Taylor*, 10 F.4th at 806 (quotation marks omitted). "When determining the reasonableness of the force used," we consider several factors, including "the severity of the crime at issue"; "whether the individual was under arrest or suspected of committing a crime"; whether the individual posed an immediate threat "to the safety of the police officers and others," including "whether the individual was armed"; whether the individual "actively resisted or attempted to evade arrest by flight"; and whether the individual "was interfering or attempting to interfere with the officer's duties." *Smith*, 10 F.4th at 736 (citations and quotation marks omitted). "The fundamental question is whether the totality of the circumstances justified" the force used by the officer. *Id.* (quotation marks omitted).

We "assess the totality of the circumstances from the perspective of a reasonable officer on the scene." *Id.* In doing so, we "consider the amount and quality of the information known to the officer at the time," including "the level of duress involved[] and the [officer's] need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Id.* (quotation marks omitted). We do not "view the events through hindsight's distorting lens," *Horton*, 883 F.3d at 950, and "[w]e remain mindful that the opportunity to debate the merits of

30

various law enforcement responses 'in the peace of a judge's chambers' is a privilege unavailable to most officers in real time." *Doxtator v. O'Brien*, 39 F.4th 852, 861 (7th Cir. 2022) (quoting *Graham*, 490 U.S. at 397).

Where, as here, an officer uses deadly force, "we focus on the danger posed by the person to whom the force was applied" by "asking 'whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others.'" *Est. of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) (quoting *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018)). Generally, deadly force is authorized "[i]f the suspect threatens the officer with a weapon" because "[a]t that point, the risk of serious physical harm to the officer or others has been shown." *Id.* at 699–700; *Sanzone*, 884 F.3d at 740. On the other hand, "someone does not pose 'an immediate threat of serious harm' solely because he is armed." *Est. of Biegert*, 968 F.3d at 700. Merely "[h]aving a weapon is not the same thing as threatening to use a weapon." *Id.*

The first circumstance we consider is one the parties vigorously dispute: whether Mendez pointed his gun at the Officers during the chase. Mendez claims that he did not; according to him, the gun remained in his waistband until he was shot and fell to the ground, and he did not have anything (let alone a gun) in his hand while he was fleeing. (Mendez Dep. at 109:6–19, 136:15–18, 151:14–152:16, 195:7–11, 196:7–8, 196:18–197:15.) In contrast, the Officers claim that Mendez had the gun in his hand and pointed it at them just before the shooting. (Cook Decl. ¶ 5; Szczur Decl. ¶¶ 4, 5; Szczur Dep. at 67:13–22, 131:8–21, 135:5–7.) Ordinarily, a jury would have to resolve conflicting testimonial evidence like this. *See Stewart*, 14 F.4th at 760. But Defendants assert this is not the case here because the Officers' bodycam footage clearly

shows that Mendez pointed a gun at the Officers.[9] (Defs.' Mem. at 14–16); *see Horton*, 883 F.3d at 944 ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage.").

After carefully reviewing the Officers' bodycam footage, we cannot conclude that it irrefutably establishes that Mendez pointed a gun at the Officers. Several factors make it difficult to tell whether Mendez held or pointed a gun at the Officers during the chase: the video footage is unsteady, as the Officers' bodycams jostled around while they ran; the chase occurred in the middle of the night, with artificial light (from the Officers' flashlights and telephone pole lights located at the beginning and the end of the alley) sporadically illuminating the scene; and the relevant events—Mendez falling, getting back up, allegedly pointing a gun at the Officers, and being shot by Szczur—all occurred within seconds. (*See* Szczur Video at 1:43–1:54; Cook Video at 0:28–0:41.) Nor do the still frames from the bodycam footage that accompany the Officers' declarations (Dkt. Nos. 209-9, 209-11) firmly settle the issue in our eyes. Thus, given Mendez's testimony that his gun remained in his waistband until he was shot, whether he held or pointed a gun at the Officers during the chase presents a genuinely disputed issue of fact.

Contrary to Mendez's assertion, though, this dispute is not "outcome-determinative." (Pl.'s Opp'n at 5.) The ultimate issue is not whether Mendez actually pointed a gun at the Officers; it is whether a reasonable officer in Szczur's situation "would have *probable cause to believe*" Mendez had pointed a gun at the Officers. *Sanzone*, 884 F.3d at 740 (emphasis added).

---

[9] Defendants also assert that two additional pieces of evidence establish that Mendez had the gun in his hand during the chase: (1) the fact that Mendez's gun ended up in front of him on the ground after he was shot; and (2) Mendez's statement, while on the ground after being shot, that he "wasn't going to shoot." (Defs.' Mem. at 16 & n.4.) But nothing in the record establishes beyond dispute that the gun could not have landed in front of Mendez if it had been in his waistband. And it would be up to a jury to determine whether Mendez's statement that he was not going to shoot undermined his assertion that he did not have a gun in his hand.

If so, the shooting was justified even if the belief was, in the end, mistaken. *Sherrod v. Berry*, 856 F.2d 802, 807 (7th Cir. 1988) (en banc) ("It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self defense at the time involved reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken." (quotation marks and emphases omitted)); *Cooper v. City of Rockford*, No. 06 C 50124, 2010 WL 3034181, at *4 (N.D. Ill. Aug. 3, 2010) ("Whether the officer was ultimately correct that a suspect threatened him with a weapon is irrelevant so long as the officer 'reasonably believed' it was so." (quoting *Sherrod*, 856 F.2d at 807)).

On this point, the bodycam footage is more helpful. As shown by the below images taken from Cook's bodycam footage at timestamp 0:38, Mendez, who is seen in the upper left-hand corner, had *something* in his right hand after he fell and got back up:





(Cook Video at 0:38 (arrows added).)  Cook's bodycam footage further establishes that Mendez then turned his head to the right and extended his right arm in the Officers' direction.





(*Id.*; *see also* Dkt. No. 209-11 at 3.)  Cook's bodycam footage establishes beyond reasonable question that Mendez had something in his right hand and that he then raised his right arm in the Officers' direction while he was running.  *See Smith*, 10 F.4th at 730 (explaining that an ambiguous or unclear video can be relied upon "for those facts that can be established with confidence and beyond reasonable question" (quotation marks omitted)).  In other words, the video footage shows that Mendez was not "shot while fleeing empty-handed" (Pl.'s Opp'n at 5), and we do not credit Mendez's testimony that he had nothing in his hand during the chase.  *See Smith*, 10 F.4th at 737; *Horton*, 883 F.3d at 944.  It is therefore undisputed that Szczur saw Mendez with an object in his hand and raise the object in the Officers' direction.  (Szczur Decl. ¶¶ 4, 5.)  The question is whether the circumstances faced by Szczur gave him probable cause to believe that the object was a gun.  *See Est. of Biegert*, 968 F.3d at 699.

We conclude that they did.  First, Szczur was investigating a matter—a report of a gunshot fired (Pl.'s Resp. to Defs.' SOF ¶ 23)—that likely involved a person armed with a gun.

*Cf. Smith*, 10 F.4th at 736 (one factor to consider is "the severity of the crime at issue"). Second, Szczur arrived in the vicinity of the shot-fired report within minutes and, upon arriving, saw only Mendez and the juvenile in the area. (Pl.'s Resp. to Defs.' SOF ¶ 24; Szczur Dep. at 117:23–118:4, 119:5–17.) An officer in this situation would reasonably believe that someone in the area had recently discharged a firearm outside. Moreover, although Mendez's and the juvenile's presence outside did not conclusively establish that either individual had a gun or recently fired a gun, a reasonable officer would have catalogued this circumstance—along with the apparent absence of anybody else in the area—while determining who fired the reported gunshot. *Cf. Smith*, 10 F.4th at 736 (one factor is "whether the individual was . . . suspected of committing a crime"). Third, Mendez interfered with the Officers' attempt to investigate the reported gunshot by jumping off the porch, running down the alley, and failing to comply with the Officers' directives. (Cook Video at 0:12–0:40; Szczur Video at 1:23–1:53; Mendez Dep. at 96:14–97:1, 106:10–107:5); *see Smith*, 10 F.4th at 736, 738–39 (a suspect's flight and failure to obey commands weighed in favor of the defendants' use of deadly force). Fourth, during the chase, Szczur heard Cook shout "waistband, waistband, waistband," which Szczur interpreted to mean that Mendez may have a weapon in his waistband, and "he's got it in his hands," which Szczur said alerted him to the fact that Mendez had a firearm in his hand. (Szczur Dep. at 124:22–126:2, 127:5–11.) After hearing Cook's shouts, an officer in Szczur's position would have reasonably believed that Mendez had a gun in his hand. *Smith*, 10 F.4th at 738–39 (defendants' reasonable belief that the plaintiff was armed with a gun weighed in favor of their use of deadly force). Fifth, immediately after hearing Cook's shouts, Szczur saw Mendez stand up with

36

something in his right hand and swing or extend[10] his right arm in the Officers' direction.  (Cook Video at 0:37–0:38; Szczur Decl. ¶¶ 4, 5; Szczur Dep. at 67:13–22, 131:15–21, 135:5–7, 140:15–17.)  At that instant—while running full speed down a dark alley in pursuit of an individual who was hampering his investigation into whether a gunshot had been recently fired in the area—Szczur had to decide whether the object Mendez had just swung in his and Cook's direction was a gun.  *See Smith*, 10 F.4th at 736 (a court must consider "the level of duress involved" and the officer's "need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances" (quotation marks omitted)).  Considering the totality of these circumstances, a reasonable officer in Szczur's position at that moment would have had probable cause to believe that Mendez was pointing a gun at him and Cook.  Szczur's use of deadly force was therefore justified.  *See Est. of Biegert*, 968 F.3d at 699–700; *Sanzone*, 884 F.3d at 740.

Mendez's attempts to resist this conclusion fall short.  At the outset, Mendez contends that several circumstances, considered in isolation, did not justify the shooting.  For instance, Mendez argues that no case permits the use of "deadly force due to a ShotSpotter alert," that "[n]ot answering a police request does not justify a seizure," that "fleeing alone is not a basis for deadly force," and that "a fast-paced chase does not provide an automatic shield from liability." (Pl.'s Opp'n at 7–9, 12.)  But whether each of these circumstances—the ShotSpotter alert, Mendez's failure to answer Szczur's question, Mendez's flight, and the fast-paced nature of the chase—*alone* would justify the shooting is not the issue; we must consider the totality of the

---

[10] This is not to say that Mendez intentionally swung or extended his right arm in the Officers' direction.  But whether he did is irrelevant, as Szczur could not have known at that moment whether the action was intentional.  *See Muhammed*, 316 F.3d at 683 ("What is important is the amount and quality of the information known to the officer at the time he fired the weapon[.]").

circumstances.  *Smith*, 10 F.4th at 736; *see also Richmond*, 924 F.3d at 411 (the totality-of-circumstances analysis for evaluating the reasonableness of a police intrusion "must not be overly focused on any one factor" (quotation marks omitted)).  As Defendants point out in their reply (Defs.' Reply at 8–9), Mendez makes no attempt to explain how the totality of the circumstances faced by Szczur did not justify his use of deadly force.  For this reason alone, Mendez has failed to meet his burden at summary judgment.  *See Horton*, 883 F.3d at 949 ("A plaintiff must show the officer's use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of the circumstances."); *Est. of Davis*, 987 F.3d at 638–39 (if the plaintiff does not show "that a trier of fact could conclude that the officer violated a federal right" in response to an assertion of qualified immunity, "summary judgment must be granted").  However, we have still considered Mendez's arguments challenging the circumstances we have found relevant to our analysis, and to the extent they have not already been addressed, we address them below.

      First, Mendez argues that summary judgment is improper because the reliability of the ShotSpotter technology is in dispute.  (Pl.'s Opp'n at 7.)  Citing *Alabama v. White*, 496 U.S. 325 (1990), Mendez contends that "[b]ecause Defendants conceded that ShotSpotter technology is unreliable, it cannot serve as a basis [for] the use of deadly force."  (*Id.*)  But Mendez does not explain how *White*, which held that an anonymous tip corroborated by independent police work "exhibited sufficient indicia of reliability to provide reasonable suspicion" for police to make an investigatory stop of a vehicle, 496 U.S. at 326–27, has any application here.  Nor does the evidence Mendez cites show a concession of unreliability.  (Pl.'s Opp'n at 7 (citing Pl.'s SOAF ¶ 77).)  At best, it shows that noises other than gunshots sometimes trigger a ShotSpotter alert. (Defs.' Resp. to Pl.'s SOAF ¶ 77; *e.g.*, Allen Dep. at 85:7–18; Cook Dep. at 35:21–36:8.)  But

the fact that the ShotSpotter technology does not identify gunshots 100% of the time does not mean it lacks any value in identifying where and when gunshots occur. *Cf. United States v. King*, 439 F. Supp. 3d 1051, 1053, 1055–58 (N.D. Ill. 2020) (the fact that the ShotSpotter system did *not* detect gunshots in the relevant area weighed against finding that the police reasonably believed that the defendant had a gun).

Mendez further claims that *United States v. Godinez*, 7 F.4th 628 (7th Cir. 2021), "acknowledged that the ShotSpotter technology must be subject to a rigorous *Daubert* analysis." (Pl.'s Opp'n at 7.) In *Godinez*, a jury had found the defendant guilty of shooting a federal agent. 7 F.4th at 631. As part of its case, the government had introduced evidence from ShotSpotter to show that the defendant was in the vicinity of the shooting. *Id.* at 631–34. The Seventh Circuit found that the district court erred by admitting this evidence without first analyzing the reliability of ShotSpotter's methodology under *Daubert*. *Id.* at 637–38. Even so, the court concluded that the admission of the ShotSpotter evidence was harmless, and it affirmed the jury's guilty verdict based on other evidence in the record. *Id.* at 631, 641–42.

We do not see—and Mendez again does not explain—how *Godinez* applies here. Unlike the situation in *Godinez*, we are not determining whether a ShotSpotter alert can be used to prove beyond a reasonable doubt that a criminal defendant was the person who fired the shots at issue. Instead, we are asking whether a ShotSpotter alert can be one circumstance out of several that establishes probable cause for a reasonable officer in Szczur's position to believe that Mendez was pointing a gun at him. *Godinez* is inapposite.

Second, Mendez disputes that he and the juvenile were the only civilians outside when the Officers arrived because Ivyl Watts, who lived at 5235 West Ohio Street, "testified that he came outside onto his porch when police arrived" and that "one of his neighbors may have also

been outside." (Pl.'s Opp'n at 7–8.) Who was actually outside when the Officers arrived, however, is not the relevant question; the relevant question is who Szczur perceived to be outside at the time. *See Horton*, 883 F.3d at 949–50 ("We evaluate excessive-force claims for objective reasonableness based on the information the officers had at the time."). And Szczur testified that Mendez and the juvenile were the only civilians outside during the investigation. (Szczur Dep. at 117:18–118:4, 119:5–17.) Even drawing all reasonable inferences from the evidence in Mendez's favor, Watts's testimony that he was outside does not suggest that Szczur was in fact aware of his presence outside.

Third, Mendez asserts that "Defendants' claim that [he] was in close proximity to the ShotSpotter alert is also open to debate." (Pl.'s Opp'n at 8 (quotation marks omitted)). We disagree. Mendez was sitting on a porch only two lots west of the address identified by the ShotSpotter alert, which is within the area encompassed by a ShotSpotter alert. (Defs.' Resp. to Pl.'s ASOF ¶ 100; Szczur Dep. at 75:17–21.) Whatever the precise meaning of "close proximity," Mendez was situated close enough to the identified address that a reasonable officer in Szczur's position would consider Mendez a person to question as part of his investigation.

Fourth, Mendez contends that his failure to respond to Szczur's questioning did not warrant the use of deadly force because Szczur did not consider the possibility that Mendez did not speak or understand English. (Pl.'s Opp'n at 8.) But Mendez does not identify any evidence suggesting that a reasonable officer in Szczur's situation should have considered this possibility, such as evidence that most, or even some, of the people living in Mendez's neighborhood do not speak or understand English.

Fifth, Mendez argues that we should deny Defendants' motion based solely on the fact that Szczur yelled that he would shoot Mendez before he ever saw a gun in Mendez's hand or

saw Mendez commit a crime. (*Id.* at 9.) According to Mendez, "[a] reasonable juror could easily find [that] this statement *alone* evinced [Szczur's] intent to shoot" him before there was any evidence of a threat. (*Id.*; *see also id.* at 10–11 (arguing that a jury could find that Szczur was angry at Mendez for running and intended to shoot him "even before any claimed gun sighting").) We do not consider Szczur's "underlying intent or motivation," though, and even "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force[.]" *Graham*, 490 U.S. at 397. This argument misses the mark as well.

Sixth, Mendez contends that there is a dispute as to whether he complied with the Officers' orders to show his hands while fleeing because he testified that he had nothing in his hand and that he did not touch his gun during the chase. (Pl.'s Opp'n at 10.) But whether Mendez had something in his hand or touched his gun during the chase has nothing to do with whether he put his hands up in the air while running away. The testimony cited by Mendez therefore does not create a dispute on this point.

Seventh, Mendez argues that Cook's shouts of "waistband" and "he's got it in his hands" do not indicate that he had a gun in his hand. (*Id.*) What is more, Mendez says, a jury could find that Cook was "angry and shouted, 'he's got it in his hands,' to provide a pretext for his partner's planned shooting." (*Id.* at 11.) Mendez's pretext argument relies solely upon speculation and cannot withstand summary judgment. *See Lewis v. Mills*, 677 F.3d 324, 331–32 (7th Cir. 2012) (the plaintiff's argument that a reasonable jury could infer that the defendant "conspired to fabricate evidence against him" was mere speculation that could not defeat summary judgment); *Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008) (argument that rested on the plaintiff's "speculation that the City's employees lied to conceal their true motives" was insufficient to withstand summary judgment). The same goes for Mendez's contention that

Cook's shouts of "waistband" and "he's got it in his hands" do not indicate the presence of a gun. Nothing about the situation—where the Officers were responding to a report of a gunshot fired—suggests that an officer in Szczur's position would *reasonably* interpret "waistband" and "he's got it in his hands" to mean anything other than the presence of a weapon. *See Bishop v. Air Line Pilots Ass'n Int'l*, 5 F.4th 684, 693 (7th Cir. 2021) (a court is "not required to draw every conceivable inference" in the non-movant's favor on summary judgment, "but only those inferences that are reasonable" (quotation marks omitted)).

Eighth, Mendez denies several aspects of Defendants' contention that he "turned his head, extended his right arm with a gun in hand in the direction of, and in close proximity to, Officers Szczur and Cook." (Pl.'s Opp'n at 11 (quotation marks omitted).) Mendez first claims that he did not turn the right side of his body towards the Officers and extend his right arm towards them (*id.*), but this claim is clearly contradicted by Cook's bodycam footage. (Cook Video at 0:38.) This fact, among others, distinguishes our case from *Giles v. Ludwig*, No. 12-cv-6746, 2014 WL 4359635 (N.D. Ill. Sept. 3, 2014), where there was no evidence that undisputedly contradicted the plaintiff's assertion that he had not turned toward the officer and raised his gun when he was shot. *See id.* at *2 (denying summary judgment on excessive force claim). Mendez then disputes that he was in "close proximity" to the Officers when he stood up after falling the first time. (Pl.'s Opp'n at 11.) But Mendez himself testified that the Officers were "really close" to him at that time. (Mendez Dep. at 111:4–18.) In any event, the bodycam footage makes clear that Mendez was close enough to the Officers when he stood up to be a threat if he had a gun, regardless of whether the distance is characterized as "close proximity." (Cook Video at 0:36–38.) Mendez also argues that "it was a physical impossibility for him to have been pointing a gun at police when he was shot" because he was "shot in the back." (Pl.'s

Opp'n at 11.)  This argument might have some traction in cases where there is no evidence undisputedly showing what the plaintiff did or how he was positioned just before being shot. *See, e.g.*, *Giles*, 2014 WL 4359635, at *1–2.  But that is not the case here.  The undisputed video evidence shows that Mendez turned his head to the right and raised his right arm in the Officers' direction less than two seconds before Szczur fired his first shot.  (Cook Video at 0:38–0:40.)  It is not physically impossible that Mendez moved in such a way in this intervening timeframe that Szczur's bullets then struck him in the back.  Furthermore, Mendez does not point to any evidence, such as an expert opinion evaluating the locations of the bullet wounds, that supports his claim of physical impossibility.  *See Cooper*, 2010 WL 3034181, at *5 (the plaintiff's argument that the decedent could not have been directly facing the officer when he was shot because of the bullet's trajectory required speculation in the absence of any evidence regarding "how a bullet travels through a body and what that trajectory might say about how [the decedent] was shot); *cf. Rios v. City of Chicago*, 523 F. Supp. 3d 1020, 1024, 1026–28 (N.D. Ill. 2021) (denying summary judgment on an excessive force claim where the plaintiff's expert's opinion regarding the wound paths from the officer's bullets provided circumstantial evidence that rebutted the officer's version of events).

Ninth, Mendez contends that the bodycam videos are inconclusive, and that the evidentiary value of the images created by Detective Chiocca is in dispute.[11]  (Pl.'s Opp'n at 14–17.)  These evidentiary attacks do not stave off summary judgment either.  Although the bodycam footage does not establish some facts beyond doubt (such as whether Mendez was holding a gun), it does so for others, and we have appropriately relied upon the footage for those

---

[11] Chiocca is a CPD detective who used software to create derivative photographs based on the Officers' bodycam footage.  (Transcript of Michael Chiocca's Deposition (Dkt. No. 209-14) at 9:8–13, 44:5–46:1, 47:5–14, 49:4–51:6; Dkt. No. 209-15.)

facts. *See Smith*, 10 F.4th at 730 (an ambiguous or unclear video can still be relied upon "for those facts that can be established with confidence and beyond reasonable question" (quotation marks omitted)). Moreover, we have not relied upon Detective Chiocca's images in determining the reasonableness of Szczur's conduct, so any dispute over their evidentiary value is immaterial.

Finally, Mendez contends that if Szczur "created the condition of fear [that] prompted [Mendez] to flee" by unlawfully entering the Property and approaching him on the porch, Szczur "cannot subsequently point to that condition as providing an objectively reasonable basis" for the shooting. (Pl.'s Opp'n at 17–18 (citing *Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996)).) This is not the law. Generally, an officer's use of deadly force is not unreasonable simply "because he created a situation where deadly force became essentially inevitable." *Est. of Biegert*, 968 F.3d at 698 (concluding that the officers' failure to make a plan for encountering the suspect, failure to secure a knife block, and aggressive questioning of the suspect did not render their "subsequent use of force unreasonable"); *Sanzone*, 884 F.3d at 740 ("[T]he law does not establish that . . . an officer may be liable [for excessive force] based on actions before the shooting that might have led to the use of force."); *see also Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1544 (2017) ("A different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure."). True, the Seventh Circuit recognized an exception to this rule in *Sledd*, where it "concluded that the officers acted unreasonably when they failed to identify themselves while forcibly entering a home to execute a search warrant in plain clothes, which resulted in their shooting a man who had armed himself thinking that the officers were intruders." *Est. of Biegert*, 968 F.3d at 698 (citing *Sledd*, 102 F.3d at 288). But the officers in *Sledd* "acted so far outside the bounds of reasonable behavior that the deadly force was almost entirely a result of the officers' actions." *Id.* The same cannot be said in this case;

Szczur did nothing on par with forcibly entering a house while failing to identify himself as a police officer. Even if Szczur's actions in entering the Property and approaching Mendez exacerbated the possibility of a dangerous confrontation, Mendez's subsequent actions—jumping off the porch, running, failing to put his hands up, and swinging his arm with an object in his hand towards the Officers—"were an intervening cause of the deadly force." *Id.*

After surveying the totality of the circumstances confronting Szczur and considering Mendez's arguments, we conclude that Mendez has failed to show that the shooting could be found to constitute an unreasonable application of deadly force. Accordingly, he has failed to defeat the first prong of qualified immunity, and we must grant summary judgment in Defendants' favor. *See Est. of Davis*, 987 F.3d at 638–39.

### 2.    Were Mendez's Fourth Amendment Rights Clearly Established?

In addition, Mendez has failed to defeat the second prong of qualified immunity, which requires him to show that Szczur's conduct violated a clearly established constitutional right. *Gaddis*, 30 F.4th at 632. Mendez argues that it was clearly established "that 'a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else.'" (Pl.'s Opp'n at 20 (quoting *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015)).) Instead of aiding Mendez's attempt to defeat qualified immunity, however, this legal principle shows that qualified immunity is appropriate because, as just discussed, an officer in Szczur's shoes would have reasonably believed that Mendez posed a threat. Mendez also does not explain how this is "an obvious case" where the Supreme Court's general standards for determining when the use of deadly force is excessive clearly establish that Szczur's conduct was unconstitutional "even without a body of relevant case law." *See Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004). Because Mendez fails to defeat the second prong of qualified immunity, summary judgment is appropriate against him on this basis as well.

45

\*       \*       \*

Mendez has failed to show both that a trier of fact could find that the shooting constituted an unreasonable application of deadly force and that the shooting violated a clearly established right. As such, we grant Defendants' motion for summary judgment on Mendez's excessive force claim.

### C. Battery

Mendez also asserts a civil battery claim under Illinois law against Szczur based on the shooting. (3AC ¶¶ 52–55; Pl.'s Resp. to Defs.' SOF ¶ 1.) Defendants argue that they are entitled to summary judgment on this claim because (1) the shooting was justified under Illinois's statute governing a peace officer's use of force in making an arrest, 720 Ill. Comp. Stat. 5/7-5, and (2) Szczur is entitled to immunity under Illinois's Local Governmental and Governmental Employees Tort Immunity Act (the "Tort Immunity Act"), 745 Ill. Comp. Stat. 10/1-101 *et seq.* (Defs.' Mem. at 20–21.)

Our conclusion that the shooting was objectively reasonable makes it legally justified under 720 Ill. Comp. Stat. 5/7-5(a). This statutory provision provides that a police officer is justified in using deadly force when "he reasonably believes, based on the totality of the circumstances, that such force is necessary to prevent death or great bodily harm to himself or such other person." 720 Ill. Comp. Stat. 5/7-5(a). Where, as here, a court finds that an officer's use of deadly force was objectively reasonable, this provision justifies the officer's use of force and protects the officer from civil liability based on the use of that force. *See Ybarra v. City of Chicago*, 946 F.3d 975, 981 & n.1 (7th Cir. 2020); *Muhammed*, 316 F.3d at 683; *see also Wilson v. City of Chicago*, 758 F.3d 875, 879–80 (7th Cir. 2014) (a plaintiff asserting a battery claim under Illinois law must prove that the touching (in that case, a shooting) lacked justification).

46

That the shooting was objectively reasonable also entitles Szczur to immunity from Mendez's battery claim under the Tort Immunity Act. The Tort Immunity Act "provides immunity to local government employees from liability for acts committed in the execution or enforcement of any law unless that act was willful or wanton." *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 117. And where an officer's actions in using deadly force were objectively reasonable, as we have concluded here, they cannot be willful and wanton. *Ybarra*, 946 F.3d at 981 n.1; *Horton*, 883 F.3d at 954.

Thus, summary judgment is granted against Mendez on his civil battery claim.

### D.  *Monell*

Mendez's *Monell* claim against the City is based on Szczur's alleged use of excessive force, and the parties have stipulated that "if no underlying constitutional violation" for excessive force is found, we will enter judgment in the City's favor on Mendez's *Monell* claim. (Mot. for *Monell* Stipulation ¶ 3; *Monell* Stipulation ¶ 2.) Because we have found that Szczur's use of force did not violate Mendez's Fourth Amendment rights, we enter judgment for the City and against Mendez on his *Monell* claim pursuant to the parties' stipulation.

### E.  **Indemnification and *Respondeat Superior***

Finally, Defendants argue that they are entitled to summary judgment on Mendez's indemnification and *respondeat superior* claims against the City. (Defs.' Mem. at 24.) According to Defendants, these claims seek to hold the City liable for Mendez's state law battery claim against Szczur, and because Szczur is not liable for battery, these claims both fail. (*Id.* at 24 & n.8.)

We agree that judgment against Mendez is appropriate on his *respondeat superior* claim. The City cannot be held liable for any of the Officers' alleged constitutional violations based on a *respondeat superior* theory, *First Midwest Bank*, 988 F.3d at 986, so the only claim the City

could be liable for based on this theory is Mendez's state law battery claim. But Szczur's immunity from liability on this claim means the City is immune too. 745 Ill. Comp. Stat. 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."); *Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 802 (1st Dist. 2006) ("[T]he officers' immunity [under the Tort Immunity Act] renders plaintiff's claim against the City moot since it is premised on the officers' liability."). We grant summary judgment in Defendants' favor on Mendez's *respondeat superior* claim.

Nonetheless, we do not agree that Mendez's indemnification claim fails in its entirety. Although the City asserts that Mendez seeks indemnification from the City only for his state law battery claim, the allegations in the operative complaint are not so limited. Instead, Mendez's indemnification count alleges that the City "is responsible for *any* judgment entered against" Szczur. (3AC ¶ 58 (emphasis added).) That would include a judgment against Szczur for conducting an unreasonable search under *Terry*. And because Defendants did not move for summary judgment on this theory, it remains in play for now. Thus, we cannot enter summary judgment for Defendants to the extent that Mendez seeks indemnification for this alleged misconduct.[12] At the same time, it is appropriate to enter judgment for Defendants on Mendez's indemnification claim to the extent it is based on the Officers' entry onto the Property and Szczur's shooting. We have concluded that these actions did not violate the Fourth Amendment or state law, so there is nothing for the City to indemnify with respect to these actions.

---

[12] As discussed above, we have ordered the parties to brief whether summary judgment is appropriate for Mendez's *Terry*-based unreasonable search theory. If we conclude that summary judgment is warranted on this theory, we will also grant summary judgment on the corresponding portion of Mendez's indemnification claim unless the parties convince us in their briefing that this would be inappropriate.

**CONCLUSION**

For the foregoing reasons, Defendants' summary judgment motion (Dkt. No. 208) is granted in part and denied in part.  We grant summary judgment for Defendants on Mendez's excessive force claim (Count I); his *Monell* claim (Count V); his battery claim (Count VI); his *respondeat superior* claim (Count VII); his indemnification claim (Count VII) to the extent it is based on the Officers' entry onto the Property and Szczur's shooting; and his unreasonable search claim (Count IX) to the extent it is based on the Officers' entry onto the Property.  We deny summary judgment for Defendants on Mendez's indemnification claim to the extent it is based on the Officers' alleged unreasonable search under *Terry*.  Mendez's motion for partial summary judgment (Dkt. No. 211) is denied in its entirety.  The parties are ordered to file briefs regarding whether summary judgment is appropriate on Mendez's *Terry*-based unreasonable search theory and the accompanying portion of his indemnification claim as directed in this opinion.  The status hearing set for October 6, 2022, is stricken and reset for December 15, 2022. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: September 26, 2022